## Case No. 17,695.

### The WILLIAM HARRIS.

[1 Ware (367), 373; 1 Law Rep. 64; 1 Hunt, Mer. Mag. 62.] [1]

District Court, D. Maine. April 17, 1837.

LIBEL FOR SEAMAN'S WAGES—DEFENSES—SEAMAN'S IMPRISONMENT .IN FOREIGN PORTS—POWERS OF CONSUL — SURVEY OF VESSEL — UNSEAWORTHINESS.

1. When the respondent wishes to avail himself of any particular matter of defence, he must present it with proper averments in his answer or by plea.

[Cited in The Rhode Island, Case No. 11,745. Quoted in The Starlight, Id. 13,810.]

2. No evidence is properly admissible but what applies to matters in issue between the parties, and nothing is in issue but what is averred on one side and denied by the other.

3. Whether the master is a competent witness for the owner in a libel against the vessel for wages. Quære.

4. He is incompetent to prove any matter of defence which originates in his own acts for which he is responsible.

5. A consul has no authority to order American seaman to be imprisoned in a foreign port.

6. A master, who procures his men to be imprisoned without good cause, will not be exempted from his liability to them for damages, by showing that the imprisonment was ordered by the consul.

[Cited in Jay v. Almy, Case No. 7,236; Tingle v. Tucker, Id. 14,057; Wilkes v. Dinsman, 7 How. (48 U. S.) 129; Patten v. Darling, Case No. 10,812.]

7. When the crew insist on a survey of the vessel, alleging that she is unseaworthy, if there be reasonable cause for a survey, the owners cannot charge the expense to the seamen.

8. The master is not a competent witness to prove that a medicine chest was on board. for the purpose of throwing the expense of medical advice on a seaman.

[Cited in The Peytona, Case No. 11,058; Patten v. Darling. Id. 10,812. The Ben Flint. Id. 1,299; Brown v. The D. S. Cage, Id. 2,002.]

9. When the sufficiency of the medicine chest is questioned, the proper evidence to be produced is the testimony of some reputatble physician who has examined it.

This was a libel for wages alleged to have been earned on a voyage from Portland to Matanzas, in the island of Cuba, and back to this port. The service was admitted, and the answer sets forth a number of charges which the owners claimed to have deducted from the wages. If all these were allowed, they would amount to more than the whole balance of wages remaining due. The several claims are mentioned in the opinion of the court, and the evidence stated by which they were supported.

Mr. Rand. for libellant.
Mr. Willis, for respondent.

WARE. District Judge. Several preliminary questions have been raised and discussed at the argument which must be disposed of

---

1 [Reported by Hon. Ashur Ware. District Judge. 1 Hunt, Mer. Mag. 62, contains only a partial report.]

before we can approach the libel on its merits. In the first place it is objected that the action is brought too soon, ten days not having elapsed after the discharge of the vessel, before the suit was commenced. . The sixth section of the act of July 20, 1790, c. 56 [1 Story's Laws, 105; 1 Stat. 133, c. 29], provides that the seamen shall be entitled to · their wages, "as soon as the voyage is ended and the cargo and ballast fully discharged at the last port of delivery." But admiralty process shall not be immediately issued against the vessel. But if the seamen "shall not be paid within ten days after such discharge, or if any dispute shall arise between the master and seamen, touching said wages, then the judge, or in case his residence is more than three miles from the place, any judge or justice of the peace may summon before him the master, to show cause why process should not issue against the vessel;" and if no sufficient cause is shown, then process to issue according to the direction of the act. But there is a proviso at the conclusion of the section that nothing in the act "shall prevent any seaman from having and maintaining an action at common law for the recovery of his wages or from immediate process out of any court having jurisdiction wherever any ship shall be found, in case she shall have left her port of delivery where her voyage ended before payment of wages, or in case she shall be about to proceed to sea before the end of ten days next after the delivery of her cargo or ballast." Now there is a distinct allegation in the libel that the vessel is about to proceed to sea before the expiration of ten days from the discharge of her cargo; and this allegation is not denied in the answer. The objection itself does not go to the merits, but is merely a dilatory exception, and if the respondent had intended to rely upon it, he should have put the question of fact in issue by a dilatory plea in the nature of a plea in abatement, or by a distinct denial of the averment in the libel by a counter allegation in his answer. As he has done neither one nor the other, the fact must be taken as admitted. No evidence can properly be received to contradict it, because the proof must be confined to the matters in issue. The court cannot travel out of the record to decide questions which the parties have not submitted to it, and nothing is submitted to its determination but what is distinctly alleged on one side and contradicted on the other. It is true that courts of admiralty are not restrained by the strict technical rules of pleading which prevail at common law, but it is not less true in all courts, that the matters in controversy must be distinctly propounded. and each party must set forth by plain and precise allegations the grounds on which he asks for the judgment of the court in his favor. as well to disclose to the adverse party the points to which he must direct his proof, as to enable the court to see what is in controversy between them. Though the objection is one merely dilatory in its nature, I

do not say that it is not in the power of the court after the parties have come prepared for a trial on the merits, to admit an amendment of the answer in order to put the fact in issue. It will be in time to decide this question when a case is presented which requires it; but in the present, all the evidence which I have heard goes fully to sustain the allegation in the libel.

The same remarks will apply to another ground of defence assumed at the argument, that is, that the misconduct of the libellant with the rest of the crew amounted to a mutiny and worked a forfeiture of wages. No defence of this kind is set forth in the answer. But as this objection goes to the merits, resting upon a charge of a very aggravated character, I should feel it to be my duty, if it were sustained by the evidence, to allow an amendment in order to bring the matter fairly before the court. Mariners, it is well known, are favored persons in this court; they are familiarly said to be the wards of the admiralty. But a court of admiralty never countenances insubordination, much less mutiny, in those who are under its protection. But in point of fact the objection is wholly unsustained by the evidence.

We are brought, then, to the real matters of defence which are set forth in the answer; these are various charges which the respondent claims to be deducted from the wages, and which, if deducted, will amount to more than the whole balance of wages remaining due. In support of these, the master [Churchill] was offered as a witness. He was objected to by the libellant's counsel as incompetent, but his testimony was taken de bene esse subject to the opinion of the court on his competency. In a libel against a vessel for wages, although a monition usually goes to the master and the owners as it did in this case, yet the master does not become technically a party in the cause, but by appearing, answering, and taking upon himself the defence. It is sometimes said in a loose sense that all the world are parties to a libel in rem, but by this general language, nothing more is meant than that all who have an interest in the thing may make themselves parties by filing their claims, and therefore they are bound by the decree so far as they have an interest in the thing. None, however, are parties in the proper sense of the word but those who make themselves such. The master, therefore, although monition to him was asked for in the libel and was issued, as he has chosen not to appear and defend, is not incompetent, as a party. If incompetent at all, it is on the ground that he has an interest in the cause. Whether he has such an interest as upon strict legal principles excludes him from testifying, is a question of some difficulty, upon which the authorities are not agreed. It was uniformly held by Judge Peters during the long period that he presided in the admiralty

court of Pennsylvania, that the master was incompetent on the ground of interest; and though this opinion was often objected to by counsel, it is not understood that it was ever overruled by the appellate court. Malone v. Bell [Case No. 8,994]; Jones v. The Phœnix [Id. 7,489]. The same principle has been adopted by the district court of Massachusetts. Dunl. Adm. Prac. 245. On the contrary, Sir William Scott held that he had no interest which went to his competency, though his relation to the cause might go materially to his credit. "The master," he says, "has no immediate interest in the suit, and therefore is not an incompetent witness by any rule of law with which I am acquainted, though it may certainly be necessary to watch his testimony with jealousy, as his conduct may constitute a material part of the adverse case." The Lady Ann, Edw. Adm. 235.

But waiving the question as to the competency of the master generally, it is clear on principle and authority that he is an incompetent witness to support any matters of defence set up, which originate in his own acts, because for those acts he may be held personally responsible. This was decided by Sir William Scott himself, in the case of The Exeter. In that case the mate of the vessel had been discharged by the master for alleged misconduct. On the return of the vessel she was libelled by Robinett, the mate, for his wages, and the deposition of the master was offered and read de bene esse, to prove the misconduct and justify the discharge. Sir William Scott held that he was clearly inadmissible, for if the discharge was not justifiable, he would be liable to the owners for any damage that they might sustain in consequence of it. "I have no doubt," says he, "from the consideration that I have been able to give to the matter, and also from conversation with eminent persons at the common law, that he is not a competent witness." 2 W. Rob. Adm. 261. Now as far as legal principles are concerned, there is a perfect identity as to several of the claims which are insisted upon as deductions from wages between the present case and that of Robinett against the Exeter. This will be evident as we proceed to examine them.

The libellant, while at Matanzas, was by the procurement of the master, for some alleged misconduct, put in prison and detained several days. The first charge claimed as a deduction is the expenses of this imprisonment, and the second is the expense of hiring another hand to supply his place while in prison. These are expenses which the master pays and charges to the owner among the expenses of the voyage. It is very certain that the master cannot charge the owner with this expense unless he can show by satisfactory proof that the imprisonment was required by the urgency of the case, and called for by the interest of the owners.

If it were unnecessary and unjustifiable, the master would be liable himself for the expenses and all the damages his own wrongful act had occasioned, besides being liable to the seamen for his personal wrong. The master is introduced as a witness to justify this imprisonment and throw these expenses on the seamen, and thus exonerate himself from his own liability. For this purpose the master is clearly an inadmissible witness. But the allegation in the libel is that the libellant was ordered to be imprisoned by the American consul, and it seemed to be assumed in the argument that this would relieve the master from his responsibility. In the first place it is to be remarked that the order of the consul was obtained by the master on his own ex parte representation. And in the second, that a consul has no authority to commit seamen to prison. The laws of the United States invest their consuls and commercial agents with certain powers to be exercised for the benefit and protection of American seamen when in foreign ports; as for the relief of destitute mariners and furnishing them with the means of returning home. But no portion of the judicial power of the United States is conferred on consuls. They cannot take cognizance of the offences of seamen in foreign ports and sentence them to punishment. When the master of a vessel finds it necessary for the purpose of preserving discipline on board his ship and maintaining his authority, to treat any of his crew with severity, as a matter of prudence it may be well for him to consult the consul and take his advice. This is usually done on his own representation of the case, but the interposition of the consul has never been supposed to exempt the master from his own responsibility. Wilson v. The Mary [Case No. 17,823].

The third charge is for the expense of the survey called by the crew. It appears that three or four days after the vessel left this port she was met by a severe gale, that she was strained by the severity of the weather, and her deck load was shifted, and that during the whole residue of the voyage she leaked so much that when the weather was bad one hand was required at the pump nearly the whole time, and when the sea was smooth, that one hand was kept at the pump nearly half the time; that after her arrival in port she continued to leak very badly until a part of the cargo was discharged. The crew did their duty faithfully without any complaint until the vessel was wholly discharged. They then required of the captain, the mate agreeing with them, a survey of the vessel, stating their opinion that she was not seaworthy, and not safe to return in. While the crew were discharging the cargo, the master had employed caulkers who had been engaged in repairing her for two days, and it was after they had left the vessel that the crew demanded a survey. It seems that they were not satisfied with the repairs that were made, and the report of the surveyors justified their apprehensions. In the first report of the surveyors on the 15th, they directed certain repairs to be made, and these having been made, on examining her again on the 21st, they pronounced her unseaworthy. The act of July 20, 1790, provides that when a vessel, bound on a voyage to a foreign port, shall, "after the voyage is begun," be found to be leaky, or otherwise unfit to proceed on the voyage, the majority of the crew with the mate may require the master to put into the nearest port and have a survey called. The master is required in the first instance to pay the expense of the survey; but if it appears that "the complaint of the crew was without foundation," then, and only then, is he authorized to deduct the amount of the expense from their wages. The statute seems from its language to contemplate the case of a vessel sailing from a port in this country to some foreign port, but the reason of the law applies as strongly to that of a vessel departing from a foreign port on her return, as leaving her home port on a foreign voyage. It contemplates also the case of a vessel which has already commenced her voyage. This case does not therefore fall within the precise words of the law. This vessel was not proceeding from a port in this country, and had not commenced her voyage. She had, however, proved herself unfit for navigation after the disaster she met with on her outward voyage, and though she had been partially repaired, it appeared from the survey that the repairs were insufficient. Is it then reasonable, without referring to the statute, that the crew should be charged with the expense of the survey, when the result proved that it was called for by the interest of the owners themselves? The charge of the expense on the crew, when their complaint is without foundation, is in the nature of a statute penalty for interrupting the voyage without reasonable cause. In this case the complaint was not unfounded, and though the facts of the case do not bring it within the words of the statute, I feel no difficulty in saying that it is within its reason. And if there were no statute, I should feel as little difficulty in holding the crew free from blame. It is an engagement implied from the very nature of the contract between the owners and the seamen, that the vessel in which the voyage is to be performed shall be seaworthy, and if in the course of the voyage she receives such damage as to be unsafe, the crew are not bound to continue in her, unless she is rendered seaworthy by sufficient repairs. They are not bound to expose their lives in a vessel which is in an unfit condition to perform the voyage.

Another charge claimed as a deduction is the sum paid for medical advice. By the general maritime law, if a seaman fall sick during the voyage, he shall be cured at the expense of the vessel. There is not a single principle of maritime law more generally rec-

ognized by the usages of all commercial nations, than this, that the expenses of the sickness of any of the crew shall be borne by the vessel. These expenses include medical advice, as well as medicine, diet, lodging, and attendance. The act of congress of 1790 (chapter 29, § 8), has introduced an exception into the law of this country in favor of the owners by providing that all vessels of certain descriptions, bound on a foreign voyage, shall be provided with a medicine chest, accompanied with suitable directions for administering the medicine; and by the construction of the act, it has been holden that if the vessel is thus provided, the expense of medical advice shall be borne by the seamen; but all other expenses of sickness are left where they are placed by the maritime law, a charge on the vessel. To exempt the vessel from the charge, then, it must be shown that there was a medicine chest on board, provided with suitable medicine in sufficient quantities and accompanied with proper directions for administering them. When a statute specially exempts a party, on the performances of a condition, from any particular liability or duty, which, before the statute, was imposed by the general law, before he can claim the exemption, he must show the conditions to have been complied with. The burden, therefore, is on the owner, to show, if the fact be not admitted, that there was a medicine chest suitably provided with medicines, and instructions for their use, if he wishes to exempt himself from a charge for medical advice.

The only evidence offered, to prove that there was a medicine chest on board, was the testimony of the captain. But it is quite clear that he is an incompetent witness to prove this fact. In case there is not one on board the vessel, the statute makes him personally liable for the expenses of medical advice; and if it be admitted that he could charge it in his account against the owners, yet, as he is liable in the first instance, he swears directly to his own discharge. Admitting, however, that there was no legal exception to his competency, it can hardly be pretended that he is a proper witness to prove the sufficiency of the medicine chest, and still less, if possible, to satisfy the court that it was accompanied with suitable directions for administering the medicine. For why is such a book of directions required, except that the requirement is founded on the reasonable presumption that the master has not sufficient knowledge of the properties of particular drugs to administer them without such directions? Whenever the sufficiency of the medicine chest is called in question, the proof which would be required would be the testimony of some reputable physician who had examined it.

With respect to the last two charges claimed to be deducted from the wages, upon the evidence before me, I am quite clear that they cannot be allowed. As to the first two char-

ges, growing out of the imprisonment, it is equally clear that the master is an inadmissible witness to support them. There is, however, other testimony on the subject, that of the seamen who were examined by the libellant, and their testimony corresponds very nearly with the statement of the master. The leaky condition in which the vessel arrived at Matanzas has been already mentioned. Notwithstanding the hard service required of the crew by the bad state of the vessel, one hand being required at the pump the greater part of the time during the whole of the voyage, it appears that the men did their duty faithfully and cheerfully until she got into port, and until the cargo was entirely discharged. After that they came forward to the captain and stated that they objected to working longer until there was a survey; that they considered the vessel unseaworthy and unsafe to return in. They did not in terms absolutely refuse to work. The strongest language which it is pretended was used, was that they had rather not work until there was a survey. Nor is it pretended that the state of the vessel was seized upon by them as a mere pretext to avoid duty. It is admitted, and it is clear from all the testimony, that the men were afraid to return in the vessel. Thus far, it appears to me the crew were free from blame. They believed, and had reason to believe, that the vessel was not in a condition to make the voyage safely, and that their lives would be endangered by returning in her without further repairs. The survey proved that their fears were well founded.

After the survey, but before any thing was done by the master towards making the repairs, which were decided to be necessary, he again ordered the men to go to their work, and they again in the same respectful, but decided manner refused. Thereupon one of them was immediately sent to prison. This was in the evening, and the next morning the same order was given by the master with the like result, when the libellant and another man were sent to prison, leaving only one green hand and a boy on board. It is not so easy to excuse the crew for persevering in their refusal to work after the survey. It could not be expected that they would proceed to load the vessel until the repairs were made, but no satisfactory reason can be given why they should not prepare the vessel for taking in her return cargo. But though the men were not free from blame, was the master justifiable in the harsh and severe measures he took to punish them? It was evident that they did not refuse to work from a disposition to insubordination; they put their refusal on the single ground that the vessel was unseaworthy, and having discharged the cargo, that they ought not to be required to enter upon the services of a new voyage unless the vessel, by proper repairs, was rendered fit for it.

It may be asked what was the captain to do. The law intrusts him with a large and

somewhat undefined authority over his men. But it is an authority analogous to that of a parent over a child, or a master over an apprentice, rather than to that of a magistrate; and the law expects him to exercise his authority with something of parental moderation and discretion. It will not justify him in resorting to the severest punishment for slight offences. In cases of urgent necessity, when the ship is in danger, and the property which his owners have intrusted to him, to say nothing of the lives of the crew, is in imminent jeopardy, the most prompt obedience is necessary, and the most energetic measures justifiable for enforcing it. But in cases where there is no such pressing urgency, the law very reasonably requires more moderation and forbearence. In the present case it can hardly admit of a doubt, if the captain had calmly explained to the crew their duty, and assured them that they should not be required to return in the vessel until she was made safe by sufficient repairs, that a crew so habitually obedient, would have complied with his orders. At any rate, the master cannot be justified in resorting to so severe a punishment until milder measures had been tried. Wilson v. The Mary [supra]. It has been doubted whether the master is authorized in any case to punish a seaman by imprisonment in a foreign port. It is not only a severe punishment in itself, but as the prison fees and other expenses are usually, in the settlement of the voyage, charged on the .earnings of the seamen, it operates in practice as a species of forfeiture of wages. I have held that in extreme cases, where a man proves incorrigibly disobedient and refractory, and where it is necessary, for the purpose of preserving order and discipline on board the vessel, that the master was justified in calling in the aid of the police, and sending a seaman to prison. But it is not a punishment to be resorted to, except in grave cases, and not until other means have been tried to bring a man to his duty. Under the circumstances of the present case, I think it was clearly unjustifiable. I decree the wages to be paid without deduction.